**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **SHATERRI JONES, individually and on behalf of all others similarly situated,**<br><br>***Plaintiff(s),***<br><br>**v.**<br><br>**RUNYON OPTOMETRY, P.A., doing business as, VISION CARE 4LIFE,**<br><br>***Defendant.*** | Case No.: 26-1062<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Shaterri Jones, ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action lawsuit against Defendant Runyon Optometry P.A., doing business as, Vision Care 4Life ("Defendant") to obtain damages, restitution and injunctive relief. Plaintiff alleges, upon personal knowledge as to Plaintiff's own actions, and upon information and belief derived from counsels' investigation and review of public documents as to all other matters, as follows:

## JURISDICTION & VENUE

1. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.§1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and a certain number of members of the class are citizens of a state different from Defendant.

2. This Court has personal jurisdiction over Defendant because its principal place of business is in this District. Defendant has also purposefully availed itself of the laws, rights, and benefits of the State of Kansas.

3. Venue is proper because at least one Plaintiff was injured in this District, Defendant maintains a principal place of business in this District, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## PARTIES

4. Plaintiff Shaterri Jones is, and at all times relevant hereto was, a resident and citizen of Wichita, Kansas. At all relevant times, Plaintiff was a patient of Vision Care 4Life and is a victim of this Data Breach.

5. Defendant Runyon Optometry P.A., doing business as, Vision Care 4Life, is a domestic professional association, with a principal place of business located at 2020 N. Woodlawn Street, Suite 390, Wichita, Sedgwick County, Kansas 67208. Defendant may be served via its registered agent Wendy Runyon at 7700 E. Kellogg Drive, Suite 703, Wichita, Kansas 67207.

## FACTUAL ALLEGATIONS

6. Defendant is a provider of eye care services such as eye examinations, laser vision correction, and ocular eye disease diagnosis.[1]

7. Plaintiff and Class Members (later defined) received Defendant's services, and, in so doing, entrusted their sensitive personal information to Defendant, which Defendant acquired while providing healthcare services to Plaintiff and Class Members.

8. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the protected health information and other personally identifiable information of

[1] https://www.visioncare4life.com/services.html

certain individuals including, but not limited to: names, dates of birth, Social Security numbers, driver's license numbers, dates of medical service, medical condition or treatment information, medical diagnosis information, Medicare or Medicaid numbers, individual health insurance policy numbers, patient account numbers, and medical record numbers ("PHI/PII" or "Private Information").

9. Upon information and belief, Defendant made promises and representations to Plaintiff and Class Members, including through Defendant's privacy policy that Private Information collected from Plaintiff and Class Members would be kept secure, that the confidentiality of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

10. Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive and valuable information and would make only authorized disclosures of this Private Information.

11. By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for ensuring the confidentiality, availability, and integrity of Plaintiff and Class Members' Private Information and for protecting such Private Information from unauthorized disclosure and exfiltration.

***The Data Breach***

12. On or about February 9, 2026, Defendant reported a data breach to the U.S. Department of Health and Human Services, Office for Civil Rights. The method of disclosure suggests that an unauthorized party gained access to Defendant's network server and accessed or

acquired certain files and folders that contained the Private Information of at least 20,000 individuals in the United States (hereafter referred to as the "Data Breach").

13. To date, Plaintiff and Class Members have not been informed of: (1) whether Defendant was able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Defendant continues to maintain is secure; (2) when Defendant's data security systems detected the Data Breach and when the Data Breach initially occurred; (3) the specific types of data that was accessed and exfiltrated; and, (3) details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again.

14. Furthermore, on information and belief, the Private Information accessed in the Data Breach was not encrypted. The access and acquisition of the Private Information from Defendant's network demonstrates that this cyberattack was targeted due Defendant's inadequate data protection measures and its status as a business that collects sensitive Private Information.

15. Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of Private Information, Defendant maintained inadequate protections prior to the Data Breach, including, but not limited to, a lack of security measures for storing and handling Private Information, as well as inadequate employee training regarding how to safeguard sensitive patient data.

16. Defendant has not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendant has modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

***The Data Breach Was Foreseeable***

17. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's data was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the information from those risks left the data in a dangerous condition.

18. Indeed, cyberattacks against the healthcare industry have become increasingly common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[2]

19. According to the Identity Theft Resource Center's *2025 Annual Data Breach Report*, the number of data compromises in 2025 (3,322) increased by five percent compared to 2024.[3] In 2024, 3,152 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[4] From 2018 until 2023, companies in the healthcare industry, such as Defendant, experienced the most data breaches among all measured industries.[5] In 2024 and 2025, the healthcare industry was the second most targeted industry for data compromises behind only financial services.[6]

20. Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals. Despite the prevalence of public

---

[2] Gordon M. Snow Statement, FBI https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-thefinancial-sector.

[3] *2025 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2026), available at: https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises

[4] *2024 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2025), available at https://www.idtheftcenter.org/publication/2024-data-breach-report

[5] *Id.*

[6] *Id.* See also, *2025 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2026) at fn. 3.

announcements of data breaches, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members.

21. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server, and, thus, the significant number of individuals who would be harmed by the unauthorized exposure of the unencrypted data.

22. As a custodian of the Private Information, Defendant knew, or should have known, the importance of safeguarding the sensitive data entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its network was breached, including the significant costs imposed on Plaintiff and Class Members as a result of a data breach.

23. The Data Breach was a direct result of Defendant's failure to implement reasonable safeguards to protect Private Information from a foreseeable and preventable risk of unauthorized disclosure. Had Defendant implemented administrative, technical, and physical controls consistent with industry standards and best practices, it could have prevented the Data Breach.

24. Upon information and belief, Defendant's conduct resulted in the unauthorized disclosure of Plaintiff's Private Information to cybercriminals and the subsequent publicity of their Private Information on the dark web. The unauthorized disclosure of Plaintiff's Private Information constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendant's failure to adequately secure the Private Information in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiff.

***Defendant Failed To Comply With HIPAA Regulations & Guidance***

25. Medical records represent the most sensitive information available concerning a person's private affairs. These records reveal intimate and personal aspects of the human condition, such as illnesses that might carry social stigma and details about substance abuse, family planning

and mental health. Congress has passed legislation under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to protect this highly confidential data, because in the wrong hands, bad actors may target and exploit the most sensitive and vulnerable populations among the public.

26. As a healthcare provider in custody of the personal information of patients, Defendant knew, or should have known, the importance of safeguarding personal data entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its information systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

27. Defendant is an entity covered by HIPAA (*see* 45 C.F.R. §160.102) and as such is required to comply with the HIPAA Privacy Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

28. Defendant is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103 (hereafter, the HIPAA Privacy and Security Rules).

29. The HIPAA Privacy Rule and Security Rule establishes national security standards for the security of electronic protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a covered entity. *See* 45 C.F.R. § 160.103.

30. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

31. HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. §164.306(e).

32. Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

33. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. §164.306(a)(1) and §164.306(a)(3); *see also* 42 U.S.C. §17902.

34. The HIPAA Breach Notification Rule also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach." 45 C.F.R. §164.404(b).

35. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R.

§164.530(e).

36. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. §164.530(f).

37. The Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), has issued guidance documents regarding securing Private Information. *See* 45 C.F.R. §§ 164.302-164.318. For example, HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of electronically stored protected health information.[7]

38. The Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to follow the guidance and tools provided by the HHS/OCR.

***This Data Breach Could Have Been Prevented If Defendant Implemented Reasonable Safeguards***

39. Upon information and belief, the Data Breach was a direct result of Defendant's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to its published privacy practices; (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of PHI/PII; (iv) encrypt PHI/PII in transit and at rest; and/or (v) ensure its third-party vendors were required to implement

---

[7] *See*, U.S. Department of Health & Human Services, Security Rule Guidance Material, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html

reasonable data protection measures consistent with Defendant's data protection obligations. Had Defendant done so, this data breach could have been prevented.[8]

40. As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[9] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[10]

41. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[11]

42. To detect and prevent cyber-attacks, Defendant could and should have implemented administrative, physical, and technical safeguards including, but not limited to, the following:

Administrative Safeguards

a. Implement policies and procedures to prevent, detect, contain, and correct security violations.
b. Conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of electronic protected health information held by the Defendant.
c. Implement security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level.
d. Apply appropriate sanctions against employees who fail to comply with the Defendant's security policies and procedures.

---

[8] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[9] *Id.* at 17.
[10] *Id.* at 28.
[11] *Id.*

e. Implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports.

f. Identify a security official who is responsible for the development and implementation of the Defendant's policies and procedures to prevent, detect, contain, and correct security violations.

g. Implement procedures: (i) for the authorization and/or supervision of employees who work with electronic protected health information or in locations where it might be accessed; (ii) to determine whether an employee's access to electronic protected health information is appropriate; and (iii) for terminating access to electronic protected health information when the employment of, or other arrangement with, a workforce member ends.

h. Implement policies and procedures that, based upon the Defendant's access authorization policies, establish, document, review, and modify a user's right of access to a workstation, transaction, program, or process.

i. Implement a security awareness and training program for all members of Defendant's workforce, including procedures for guarding against, detecting, and reporting malicious software.

j. Implement policies and procedures to address how the Defendant will identify and respond to suspected or known security incidents; mitigate, to the extent practicable, known harmful effects of security incidents; and document security incidents and their outcomes.

k. Establish (and implement as needed) policies and procedures for responding to an emergency or other occurrence that damages systems that contain electronic protected health information.

l. Perform a periodic technical and nontechnical evaluation in response to environmental or operational changes affecting the security of electronic protected health information.

m. Contractually obtain satisfactory assurances that business associates will appropriately safeguard electronic protected health information.

n. Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

o. Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

p. Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

<u>Physical Safeguards</u>

q. Implement policies and procedures to limit physical access to its electronic information systems and the facility or facilities in which they are housed, while ensuring that properly authorized access is allowed.

r. Implement policies and procedures that specify the proper functions to be performed, the manner in which those functions are to be performed, and the physical attributes of the surroundings of a specific workstation or class of workstation that can access electronic protected health information.

s. Implement policies and procedures that govern the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items within the facility.

Technical Safeguards

t. Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights.

u. Implement electronic procedures that terminate an electronic session after a predetermined time of inactivity.

v. Implement a mechanism to encrypt and decrypt electronic protected health information.

w. Implement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health information.

x. Implement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed.

y. Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

z. Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

aa. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

bb. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

cc. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

dd. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

ee. Configure firewalls to block access to known malicious IP addresses.

ff. Set anti-virus and anti-malware programs to conduct regular scans automatically.

gg. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

hh. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

ii. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

jj. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

kk. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

ll. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

mm. Execute operating system environments or specific programs in a virtualized environment.

nn. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

oo. Conduct an annual penetration test and vulnerability assessment.

pp. Secure your backups.[12]

qq. Identify the computers or servers where sensitive personal information is stored.

rr. Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

ss. Don’t store sensitive consumer data on any computer with an internet connection unless it’s essential for conducting your business.

tt. Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer

[12] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

uu. Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

vv. Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

ww. To detect network breaches when they occur, consider using an intrusion detection system.

xx. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[13]

43. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to detect and prevent the unlawful exposure of Private Information.

44. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should: (i) protect the personal customer information that they keep; (ii) properly dispose of personal information that is no longer needed; (iii) encrypt information stored on computer networks; (iv) understand their network's vulnerabilities; and (v) implement policies to correct security problems.

45. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

46. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

[13] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (accessed June 11, 2024).

on the network; and verify that third-party service providers have implemented reasonable security measures.

47. The circumstances surrounding the Data Breach indicate that Defendant failed to identify risks and vulnerabilities within its information systems that would permit an unauthorized party to gain access to the sensitive data in its custody. Defendant could have prevented this Data Breach by implementing, at the very least, data encryption (in transit and at rest), a zero-trust architecture, network segmentation, and/or data exfiltration protection.

48. The Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to implement reasonable administrative, technical and/or physical safeguards mandated by HIPAA regulations. By failing to comply with these accepted standards, Defendant opened the door for cybertheft—thereby causing the Data Breach.

***Plaintiff & Class Members Sustained Damages From The Data Breach***

49. The invasion of the Plaintiff's and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendant's conduct. As a consequence of the Data Breach, Plaintiff and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

50. Additionally, Plaintiff and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their names, social security numbers, and dates of birth were targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

51. Furthermore, Plaintiff and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware,

or otherwise exposing themselves to cybercrime, where their names and contact information were acquired in the Data Breach and subsequently released on the dark web. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

52. Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[14] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

53. Given the type of targeted attack in this case, the sophistication of the criminal responsible for the Data Breach, the categories of data involved in the Data Breach, hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed, or will be placed, on the dark web, it is reasonable for Plaintiff and the Class Members to assume that their Private Information was obtained by, or released to, criminals intending to utilize the data for future identity theft-related crimes or exploitation attempts.

54. The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiff and Class Members

[14] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

55. The disclosure of Plaintiff and Class Members' data on the dark web further illustrates that PHI/PII are valuable commodities for which a "cyber black market" exists in which criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites.

56. The PHI/PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials; for example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200[15]; Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web[16]; and other sources report that criminals can also purchase access to entire company data breaches from $999 to $4,995.[17]

57. Medical records can be worth up to ten times (10x) more than credit card information. Notably, information like medical history and insurance identifiers are permanent, and the exploitation window can last for decades. Furthermore, because these records are immutable, they can sell for $260-$310 per record on the dark web.[18]

58. Identity thieves can use Plaintiff and Class Members' Private Information to perpetuate a variety of crimes that harm victims. Medical identity theft, for example, involves the

---

[15] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs

[16] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web

[17] *In the Dark, VPNOverview*, 2019, available at: https://vpnoverview.com/privacy/anonymousbrowsing/in-the-dark

[18] *Healthcare Data Breach Statistics 2025: Why Medical Records Are Worth 10× More Than Credit Cards*. (Nov. 4, 2025). Available at: https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards

misuse of a person's unique medical identity to wrongfully obtain health care goods, services, or funds.[19] Medical identity theft "can result in bills for procedures the patient has never had, inaccurate medical records, and potentially life-threatening care."[20]

59. Typically, hackers sell the personal information in medical records "to criminals who create phony providers to submit fraudulent claims on a mass scale that can result in hundreds of millions of dollars in Medicaid, Medicare, or other insurance fraud."[21]

60. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[22]

61. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[23] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[24]

62. Of course, a stolen Social Security Number can be used to cause serious harm.

---

[19] *See*, *Common Types of Health Care Fraud*, Center for Medicare & Medicaid Services (CMS) Fact Sheet, available at: https://www.cms.gov/files/document/overviewfwacommonfraudtypesfactsheet072616pdf

[20] *Healthcare fraud and the burden of medical ID theft*, available at: https://www.experian.com/blogs/healthcare/healthcare-fraud-and-the-burden-of-medical-id-theft/

[21] *Someone could steal your medical records and bill you for their care.* https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself

[22] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/

[23] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costlyfor-victims/

[24] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcaredata-breach-what-toknow-about-them-and-what-to-do-after-one/

LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

63. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of personal information to have stolen because they are immutable and may be put to a variety of fraudulent uses and are difficult for an individual to change.

64. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [25] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[26]

65. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls

---

[25] *See* Social Security Admin, *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm.

[26] *Id.*

> from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[27]

66. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[28] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[29]

67. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

68. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

69. As a result of the Data Breach, Plaintiff's and Class Members' PHI/PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any

---

[27] Social Security Admin., *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[28] *See* Social Security Admin., *How to Protect Yourself from Social Security Number Identity Theft*, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/.

[29] *See* Julia Kagan, *What Is an SSN? What to Know About Social Security Numbers* (Sept., 2, 2024), https://www.investopedia.com/terms/s/ssn.asp.

[30] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PHI/PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

70. Defendant breached its common law, contractual, and/or statutory duties to safeguard the Private Information in its custody, which resulted in the Data Breach. Plaintiff and Class Members now face years of monitoring of their personal records. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to fraudulent use of their personal data.

71. In 2024, the Identity Theft Resource Center ("ITRC") reported that 51.7% of general consumers had their personal information stolen or misused in the past 12 months.[31] The ITRC report also noted that "[a]mong the general population victims in 2025, 31.5% reported being victimized twice, and 24.6% were victimized three times within the past year."[32]

72. Also, synthetic identity theft is rising. "A synthetic identity is a digital persona that combines real and fictitious information. Stolen personal data, such as names, addresses, and social security numbers, are combined with fabricated elements to create profiles that appear authentic. These convincing profiles bypass fraud detection, making them difficult to trace."[33] During the first quarter of 2025, synthetic identity fraud "rose by over 300% with attackers exploiting generative AI" to create fake documents.[34]

---

[31] *2025 Consumer Impact Report*, Identity Theft Resource Center, October 2025, available at: https://www.idtheftcenter.org/wp-content/uploads/2025/10/The-2025-ITRC-Consumer-Impact-Report.pdf
[32] *Id.*
[33] *See*, Learn How AI Is Transforming Technology and Accelerating Cyber Threats, October 2025, https://www.usi.com/executive-insights/executive-series-articles/featured/personal-risk/q4-2025/learn-how-ai-is-transforming-technology-and-accelerating-cyber-threats/
[34] https://sumsub.com/newsroom/synthetic-identity-document-fraud-surges-300-in-the-u-s-sumsub-warns-e-commerce-healthtech-and-fintech-at-risk/

73. Individuals whose Private Information was compromised in the Data Breach, including Plaintiff and Class Members, were unknowingly and unwittingly exposed to an ongoing risk of misuse of their Private Information.

74. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. This conclusion is based on an analysis of years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud. In 2024, 81% of participants surveyed from the general population and 79% of victims who sought help from the ITRC said they received at least one data breach notification.[35]

75. As a consequence of the Data Breach, Plaintiff and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring, dark web scanning and identity theft protection can cost around $200 a year.

76. The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

77. In addition to the invasion of the Plaintiff and Class Members' privacy suffered in this Data Breach, and the substantial risk of future identity theft, fraud or exploitation, Plaintiff and Class Members also experienced emotional harms traceable to the Defendant's failure to adequately secure the Private Information in its custody, which constitutes a redressable injury.

---

[35] 2024 Consumer Impact—Business Impact Report, Identity Theft Resource Center (Oct. 2024), available at: https://www.idtheftcenter.org/wp-content/uploads/2024/10/ITRC2024ConsumerandBusinessImpactReport.pdf

78. The Department of Justice's Bureau of Justice Statistics survey evidences the emotional suffering experienced by victims of identity theft:

a. 75% of respondents reported feeling severely distressed;

b. 67% reported anxiety;

c. 66% reported feelings of fear related to personal financial safety;

d. 37% reported fearing for the financial safety of family members;

e. 24% reported fear for their physical safety;

f. 15.2% reported a relationship ended or was severely and negatively impacted by identity theft; and

g. 7% reported feeling suicidal.[36]

79. "As the real-world consequences of identity misuse intensify, so too does the emotional burden on the victim – exacerbating any other stress in a victim's life."[37] Severe emotional distress is a near-universal component of the experience.[38]

80. As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class Members have already been harmed by the fraudulent misuse of their Private Information, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives.

---

[36] *Victims of Identity Theft*, Bureau of Justice Statistics (Sept. 2015) http://www.bjs.gov/content/pub/pdf/vit14.pdf

[37] *2025 Consumer Impact Report*, Identity Theft Resource Center, October 2025, available at: https://www.idtheftcenter.org/wp-content/uploads/2025/10/The-2025-ITRC-Consumer-Impact-Report.pdf

[38] *Id.*

81. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam emails, text, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

82. Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. By transacting business with Plaintiff and Class Members, collecting their Private Information, and then permitting the unauthorized disclosure of the information, Plaintiff and Class Members were deprived of the benefit of their bargain.

83. When agreeing to pay Defendant for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendant did not invest the funds into implementing reasonable data security practices. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

84. Defendant's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including: (a) the theft and misuse of their private information; (b) the substantial risk of fraud and identity theft posed by their Private Information being placed in the hands of criminals and subsequently published on the dark web; (c) the unauthorized disclosure of their Private Information; (d) ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach; (e) future costs of credit monitoring and identity theft protection; (f)

ascertainable losses in the form of deprivation of the value of their Private Information, for which there is a well-established national and international market; (g) lost time spent to mitigate the actual and future consequences of the Data Breach; (h) lost benefit of the bargain; and (i) nominal damages.

85. While Plaintiff and Class Members' Private Information has been stolen, Defendant continues to hold Plaintiff and Class Members' Private Information. Plaintiff has a continuing interest in ensuring that personal information is kept confidential and protected from disclosure, and Plaintiff should be entitled to injunctive and other equitable relief.

86. Plaintiff brings this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendant's inadequate data protection practices and for failing to provide timely and adequate notice of the Data Breach.

## CLASS ALLEGATIONS

87. Plaintiff brings this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

88. The Class that Plaintiff seeks to represent is defined as follows:

> **Nationwide Class:** All individuals residing in the United States whose Private Information was potentially accessed or acquired by an unauthorized party as a result of the Data Breach that was disclosed by Defendant on, or about, February 9, 2026 (the "Class" or "Class Members").

89. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

90. Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

91. Numerosity: The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and such number is exclusively in the possession of Defendant, upon information and belief, at least 20,000 individuals were impacted in Data Breach.

92. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, includes the following:

a. Whether Defendant engaged in the conduct alleged herein;
b. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;
c. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff and Class Members' Private Information from unauthorized access and disclosure;
d. Whether Defendant had a duty not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;
e. Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;
f. When Defendant actually learned of the Data Breach;
g. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;
h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
i. Whether Defendant's information security systems prior to and during the Data Breach were protected in a manner consistent with industry standards;

j. Whether Defendant adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

k. Whether Defendant breached duties to protect Plaintiff and Class Members' Private Information;

l. Whether Defendant was unjustly enriched by its conduct as alleged herein;

m. Whether Defendant was negligent;

n. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief;

o. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and,

p. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief restitution, disgorgement, and/or the establishment of a constructive trust, to redress the imminent and ongoing harm faced as a result of the Data Breach.

93. Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

94. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

95. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other

Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

96. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

97. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

98. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

99. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

100. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PHI/PII of Class Members. Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

101. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

102. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the Plaintiff and the Class of the Data Breach;
b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, sharing, storing, and safeguarding their PHI/PII;
c. Whether Defendant's (or their vendors') security measures to protect its network were reasonable in light of industry best practices;
d. Whether Defendant's (or their vendors') failure to institute adequate data protection measures amounted to negligence;
e. Whether Defendant failed to take commercially reasonable steps to safeguard PHI/PII;
f. Whether Defendant made false representations about their data privacy practices and commitment to the security and confidentiality of personal information; and

g. Whether adherence to HIPAA rules and/or other data privacy recommendations and best practices would have prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I: NEGLIGENCE
**(*On behalf of Plaintiff and the Class*)**

103. Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

104. Defendant had obligations created by the statute, common law, and industry standards to keep Plaintiff and Class Members' personal information confidential and to protect it from unauthorized access and disclosure.

105. While providing a health care service, Defendant collects, creates, stores, or shares information about Plaintiff and Class Members' health status, provision of health care, or payment for health care that can be used to identify Plaintiff and Class Members.

106. Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would adequately safeguard their information.

107. Defendant had full knowledge of the types of Private Information it collected and the types of harm that Plaintiff and Class Members would suffer if that data was accessed and acquired by an unauthorized third-party. Plaintiff and Class Members were the foreseeable victims of Defendant's inadequate data security practices.

108. By collecting, sharing, using and storing the Plaintiff and Class Members' Private Information on its network, Defendant assumed a duty to Plaintiff and Class Members to exercise reasonable care to safeguard the personal data it obtained, maintain its confidentiality and protect it from unauthorized access and disclosure.

109. Defendant's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors to implemented reasonable administrative, technical, and physical measures to protect the character of data in their custody; (iii) complied with applicable statutes, industry standards, and data protection obligations; (iv) conducted regular privacy assessments and security audits of Defendant's and/or its vendors' data processing activities; (v) adequately trained and supervised its workforce regarding their data protection obligations; (vi) deleted information that it no longer needed to maintain; and, (vii) implemented processes by which it could detect a breach of its information systems in a reasonably expeditious period of time and provide timely notice to individuals impacted by a data breach.

110. Defendant is also a covered entity, as defined by HIPAA and, as such is required to comply with the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A, C, and E. Under these rules, Defendant had a duty to implement reasonable and appropriate safeguards for the protected health information under its control. Defendant is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

111. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires Defendant to provide notification no later than 60 calendar days after the discovery of an unauthorized disclosure of unencrypted protected health information. Such notice was necessary

to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any fraudulent usage of their PHI/PII.

112. The HIPAA Privacy, Security, and Breach Notice Rules inform the standard of care in this matter because Plaintiff and Class Members are within the class of persons HIPAA regulations were designed to protect and the harm suffered is of the type the regulations were intended to prevent.

113. Defendant was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach. Plaintiff and Class Members could not assess the Defendant's data security practices and Defendant knew that Plaintiff and Class Members would rely on it to protect their Private Information.

114. Defendant knew, or should have known, that the Private Information in its custody was a target for cybercriminals, and that it would likely be a target of a cyberattack due to its weak security posture. Despite the foreseeable risk of a cyberattack, Defendant failed to implement reasonable security measures.

115. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* RESTATEMENT (SECOND) OF TORTS § 302B.

116. Defendant breached its duty to protect and safeguard the Private Information of Plaintiff and Class Members from unauthorized access by failing to conduct regular privacy risk assessments, vulnerability testing, and security audits; failing to implement measures to monitor

its network and detect cybersecurity incidents and threats to Private Information; failing to timely notify Plaintiff and Class Members of the Data Breach; and/or failing to use reasonable measures to maintain the confidentiality of Plaintiff and Class Members' Private Information.

117. Defendant breached its duties and thus was negligent. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to encrypt Private Information in transit and at rest;

b. Failing to adopt, implement, and maintain reasonable administrative, technical, and physical measures to safeguard Private Information;

c. Failing to adequately assess and monitor the security of its networks and information systems;

d. Failing to implement and maintain adequate mitigation policies and procedures;

e. Allowing unauthorized access to Private Information;

f. Failing to detect in a timely manner that Private Information had been compromised;

g. Failing to destroy or delete Private Information it was no longer required to retain;

h. Failing to timely notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

i. Failing to implement data security practices consistent with Defendant's published privacy policies.

118. Defendant's failure to fulfill its duties to Plaintiff and Class Members was wrongful, wanton, reckless, and grossly negligent considering the foreseeable risks, and the high probability of harm.

119. It was foreseeable that a breach of security would occur, given the known frequency of cyberattacks and data breaches in the healthcare industry.

120. The injuries resulting to Plaintiff and the Class because of Defendant's failure to use adequate security measures was also reasonably foreseeable.

121. Plaintiff and the Class were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PHI/PII and the critical importance of protecting that data. By failing to adequately protect the PHI/PII in its custody, Defendant acted with a reckless indifference to the consequences.

122. But for Defendant's breach of duties owed to Plaintiff and the Class, their Private Information would not have been compromised in this Data Breach. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.

123. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendant prevented Plaintiff and Class Members from taking meaningful, proactive steps to secure their Private Information and mitigate the impact of the Data Breach. As a result, Plaintiff and Class Members suffered harm from Defendant's delay in notifying them of the Data Breach.

124. Plaintiff and Class Members could have enrolled in credit monitoring, medical monitoring, instituted credit freezes, and changed their passwords, among other things, had they been alerted to the Data Breach in a reasonable time.

125. As a direct and proximate result of the Defendant's conduct, Plaintiff and Class Members have suffered, or will suffer, damages and injuries including, but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft,

medical/financial fraud, and subsequent unauthorized use of their Private Information; (vi) statutory damages; (vii) anxiety, emotional distress, and other economic and non-economic losses; (viii) nominal damages; (ix) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data; and (x) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information.

126. Plaintiff and Class Members are entitled to actual, nominal, consequential and punitive damages in an amount to be determined at trial.

**COUNT II: BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

127. Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

128. Defendant creates or collects Private Information from Plaintiff and Class Members in the ordinary course of providing medical services.

129. Plaintiff and Class Members were required to provide their Private Information to Defendant to receive medical services. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for medical services and for the protection of the Private Information that was exchanged to obtain those medical services.

130. In delivering, directly or indirectly, their Private Information to Defendant and paying for healthcare services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard their Private Information.

131. Plaintiff and Class Members reasonably expected that the Private Information they entrusted to Defendant in connection with their medical treatment would remain confidential and would not be disclosed to unaffiliated third parties without their prior authorization.

132. Defendant published a privacy policy to inform the public about how Defendant collects, uses, shares, and protects the information Defendant gathers. Defendant represented through its notices of privacy practices, patient intake forms, website, and other business conduct that it will maintain the confidentiality of patient data.

133. Plaintiff and Class Members paid money and provided their Private Information to Defendant as required. In so doing, Plaintiff and Class Members entered implied contracts with Defendant by which Defendant agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the Private Information it obtained from Plaintiff and Class Members.

134. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of an expressed or implied promise to implement reasonable data protection measures. The implied covenant of good-faith and fair dealing included the promise of confidentiality, which exists independent of Defendant's duties under HIPAA and other state or federal regulations.

135. The implied promise of confidentiality included, but is not limited to: (i) ensuring Defendant's agents or vendors who were granted access to Private Information protected the confidentiality of that information; (ii) ensuring Private Information in the possession and control of Defendant, its agents, and/or vendors was only disclosed to achieve an authorized medical purpose; (iii) restricting access to Private Information to authorized, qualified and properly trained agents and/or vendors; (iv) designing and implementing appropriate data retention policies; (v)

encrypting the Private Information in transit and at rest; (vi) implementing a zero-trust architecture, role-based access controls, and requiring multifactor authentication for access to the Private Information; and (vii) taking other steps necessary to protect against the foreseeable threat of data breaches.

136. Plaintiff and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

137. Defendant knew that Plaintiff and Class Members' Private Information was highly sought after by cybercriminals, and must be protected, and that this protection was of material importance to Plaintiff and Class Members.

138. Defendant breached the implied contract with Plaintiff and Class Members by failing to adequately protect and take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of their Private Information.

139. As a direct and proximate result of the Defendant's breach of an implied contract, Plaintiff and Class Members suffered injuries as described herein, and are entitled to actual, nominal, consequential and punitive damages, and reasonable attorneys' fees and costs, in an amount to be determined at trial.

**COUNT III: UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

140. Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

141. Plaintiff brings this Count in the alternative to the breach of implied contract count above.

142. By providing their Private Information, in connection with medical treatment, services, or the payment therefore, Plaintiff and Class Members conferred a monetary benefit on

Defendant. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit.

143. Plaintiff and Class Members understood that a portion of the money they paid to Defendant was to be used by Defendant to provide data security measures that were appropriate for the nature of the data collected. Upon information and belief, Defendant funds its data protection measures with the revenue it generates from Plaintiff and Class Members. The exact amount of Defendant's budget that was to be allocated to data security measures is unknown to Plaintiff at this time.

144. By collecting the Private Information, Defendant was obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been compromised or stolen.

145. Protecting the Private Information of Plaintiff and Class Members is integral to Defendant's business because Defendant could not provide medical services with this information. Furthermore, the Private Information has monetary value to Defendant.

146. Defendant failed to secure Plaintiff and Class Members' Private Information and, therefore, it would be unjust for Defendant to retain any of the benefits that Plaintiff and Class Members conferred upon Defendant without paying value in return.

147. Defendant was unjustly enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant chose to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand,

suffered as a direct and proximate result of Defendant's failure to invest in the requisite data security measures.

148. If Plaintiff and Class Members knew that Defendant would not secure their Private Information, they would not have allowed Defendant to collect their Private Information. Now, Plaintiff and Class Members lack an adequate remedy at law.

149. As a direct and proximate result of the Defendant's conduct, Plaintiff and Class Members have suffered, or will suffer, damages and injuries including, but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, medical/financial fraud, and subsequent unauthorized use of their Private Information; (vi) statutory damages; (vii) anxiety, emotional distress, and other economic and non-economic losses; (viii) nominal damages; (ix) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data; and (x) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information

150. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

**COUNT IV: BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiff and the Class)**

151. Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

152. In providing their Private Information to Defendant, Plaintiff and Class Members justifiably placed a special confidence in Defendant to act in good faith and with due regard for the interests of Plaintiff and Class Members.

153. Defendant had a fiduciary duty to Plaintiff and Class Members as a result of the physician-patient relationship whereby Defendant became the custodian of Plaintiff and Class Members' Private Information. Plaintiff and Class Members reposed trust and confidence in Defendant to adequately safeguard the Private Information collected or created during that relationship and to timely notify them of a Data Breach. Defendant accepted the special confidence Plaintiff and Class Members placed in it, as evidenced by Defendant's acknowledgement that it had a legal duty to protect Plaintiff' and Class Members' information.

154. Defendant had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of the physician-patient relationship, in particular, to keep secure the Private Information of their patients.

155. Defendant's fiduciary duties and violations thereof are informed by HIPAA. Defendant breached the fiduciary duties owed to Plaintiff and Class Members by failing to ensure the confidentiality, integrity, and availability of electronic PHI that Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. §164.306(a)(1).

156. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to implement technical policies and procedures for information systems that maintain

electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1).

157. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. §164.308(a)(1).

158. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. §164.306(a)(2).

159. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules in violation of 45 C.F.R. §164.306(a)(3).

160. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. §164.306(a)(4).

161. Defendant breached fiduciary duties owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*

162. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to effectively train all members of its workforce on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5).

163. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. §164.530(c).

164. Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to notify Plaintiff and Class Members that their unsecured PHI had been compromised within 60 days of discovery of the Data Breach, in violation of 45 C.F.R. §164.404.

165. Defendant breached its fiduciary duty to Plaintiff and Class Members by failing to adequately protect its information systems against cybersecurity events and failing to notify Plaintiff and Class Members in a reasonable time after discovery of the Data Breach.

166. As a direct and proximate result of the Defendant's breach of fiduciary duties, Plaintiff and Class Members have suffered, or will suffer, damages and injuries including, but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, medical/financial fraud, and subsequent unauthorized use of their Private Information; (vi) statutory damages; (vii) anxiety, emotional distress, and other economic and non-economic losses; (viii) nominal damages; (ix) the continued and increased risk their data will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data; and (x) future costs in terms of time, effort, and money that will be expended to prevent,

detect, contest, and repair the inevitable and continuing consequences of compromised Private Information.

167. As a direct and proximate result of Defendant's breach of fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, as described herein. Accordingly, Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages in an amount to be determined.

168. Defendant's breaches of fiduciary duty are ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

169. Plaintiff and Class Members are entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; (iii) provide adequate credit monitoring and identity theft protection to all Class Members; and (iv) provide complete and accurate information to affected individuals about the Data Breach and the risk patients face.

**COUNT V: DECLARATORY JUDGMENT**
**(On behalf of Plaintiff and the Class)**

170. Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

171. Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq.,* this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further relief as necessary. Furthermore, the Court has broad authority to restrain acts, that are tortious and violate the terms of the federal and state statutes described herein.

172. An actual controversy has arisen following the Data Breach with respect to Defendant's data security measures and the propriety of Defendant's efforts to protect and maintain the confidentiality, availability, and integrity of Plaintiff and Class Members' Private

Information.

173. Plaintiff and Class Members are at risk of additional harm due to the exposure of their Private Information in the Data Breach and Defendant's failure to adequately address the privacy and security failures that led to the exposure.

174. Plaintiff and Class Members have suffered irreparable injury, and will continue to suffer injury in the future, as a result of Defendant's practices, which places Plaintiff and Class Members at imminent risk that further compromises of their Private Information will occur in the future. As such, the remedies available at law are inadequate to compensate for that injury. Accordingly, Plaintiff and Class Members also seek to obtain a judgment declaring, among other things, the following:

a. Defendant's existing privacy and security measures do not comply with its obligations and duties to maintain the privacy and security of Private Information;

b. Defendant continues to owe a legal duty to secure Private Information and to timely notify patients of a data breach under the common law, HIPAA, Section 5 of the FTC Act, and

c. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff and Class Members' Private Information.

175. Plaintiff also seek a declaration that Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a. Defendant must engage third-party security auditors and establish an internal security team to conduct penetration testing, vulnerability scanning, tabletop exercises, simulated attacks and regular audits of Defendant's information systems and Defendant must promptly correct any problems or issues detected;

b. Defendant must implement intrusion detection and intrusion prevention systems (IDS/IPS) and other automated security monitoring;

c. Defendant must implement a security awareness and training program for all members of its workforce (including management) regarding procedures for guarding against, detecting, and reporting malicious software, and regularly update the training program as new vulnerabilities, threats, and other issues arise;

d. Defendant must segment its network, including using firewalls and access controls, to prevent hackers from gaining access to Private Information and/or moving laterally throughout its network to gain access to Private Information;

e. Defendant must implement data retention and destruction policies that require Defendant to securely delete Private Information that is no longer needed; and

f. Defendant must perform periodic technical and nontechnical evaluations, based upon the standards implemented under HIPAA and, in response to environmental or operational changes affecting the security of Private Information, that establishes the extent to which Defendant's security policies and procedures meet the requirements of HIPAA and the Court's Order.

176. The Court also should issue corresponding prospective injunctive relief requiring that Defendant employs adequate data protection practices consistent with law and industry standards.

177. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiff will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

178. The issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging Defendant to take necessary action to prevent another data breach, thus eliminating the additional injuries that would result to Plaintiff and the multitude of individuals whose Private Information would be at risk of future unauthorized disclosures.

## COUNT VI: INVASION OF PRIVACY — INTRUSION UPON SECLUSION
**(On behalf of Plaintiff and the Class)**

179. Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

180. Defendant had exclusive control over its information technology environment. At all times, Defendant was aware that the information in its possession contained highly sensitive and confidential personal information.

181. Defendant permitted its information technology environment to remain vulnerable to foreseeable threats, which created an atmosphere for the Data Breach to occur. Despite knowledge of the substantial risk of harm created by these conditions, Defendant intentionally disregarded the risk, thus permitting the Data Breach to occur.

182. By permitting the unauthorized disclosure, Defendant acted with reckless disregard for the Plaintiff's and Class Members' privacy, and with knowledge that such disclosure would be highly offensive to a reasonable person. Furthermore, the disclosure of the Private Information at issue was not newsworthy or of any service to the public interest.

183. Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized disclosure of Plaintiff and Class Members' data.

184. Defendant's conduct was especially egregious and offensive as it failed to have adequate security measures in place to prevent, track, or detect in a timely fashion unauthorized access to Plaintiff and Class Members' personal information.

185. Defendant acted with such reckless disregard as to the safety of Plaintiff and Class Members' Private Information to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiff and Class Members.

186. Defendant intentionally intruded upon the solitude, seclusion and private affairs of Plaintiff and Class Members by intentionally configuring its information systems in a way that left

them vulnerable to malware/cyberattack, thus permitting unauthorized access to Plaintiff and Class Members' Private Information.

187. Plaintiff and Class Members have a reasonable expectation of privacy in their Private Information. The Private Information that was disclosed without the Plaintiff and Class Members' authorization was highly sensitive, private, and confidential. The public disclosure of the type of data at issue here would be highly offensive to a reasonable person of ordinary sensibilities.

188. The disclosure of their sensitive and confidential personal information was highly offensive to Plaintiff and Class Members because it violated expectations of privacy that have been established by general social norms, including by granting unauthorized access to information that would not otherwise be disclosed.

189. Defendant's conduct would be highly offensive to a reasonable person in that it violated statutory and regulatory protections designed to protect the Private Information, in addition to social norms. Defendant's conduct would be especially egregious to a reasonable person as Defendant publicly disclosed Plaintiff and Class Members' sensitive and confidential personal information without their consent.

190. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including, but not limited to, an invasion of their privacy rights.

191. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's intrusion upon seclusion and are entitled to just compensation.

192. Plaintiff and Class Members are entitled to appropriate relief, including compensatory damages for the harm to their privacy, loss of valuable rights and protections, and heightened stress, fear, anxiety, and risk of future invasions of privacy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Class alleged herein, respectfully requests that the Court enter judgment as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative for the Class and counsel for Plaintiff as Class Counsel;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and Class Members' Private Information, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members regarding the Data Breach;

D. For injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

E. For compensatory, statutory, consequential, and punitive damages in amounts to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendant's conduct;

H. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and,

I. Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: March 12, 2026.

Respectfully Submitted,
*/s/ James J. Rosemergy*
James J. Rosemergy #79248
**CAREY, DANIS & LOWE**
8235 Forsyth Blvd #1100,
St. Louis, MO 63105
P: 314-725-7700
E: jrosemergy@careydanis.com

-AND-

Paul J. Doolittle, Esq.*
**POULIN | WILLEY | ANASTOPOULO, LLC**
32 Ann Street, Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

**Pro Hac Vice* forthcoming

*Attorneys for Plaintiff & Proposed Class*